UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Angela Deoliveira[1]

 v.                              Civil No. 17-cv-671-JL
                                 Opinion No. 2019 DNH 001
Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration


**O R D E R**

Angela Deoliveira moves to reverse the decision of the
Acting Commissioner of the Social Security Administration
("SSA") to deny her applications for Social Security disability
insurance benefits ("DIB") under Title II of the Social Security
Act, 42 U.S.C. § 423, and for supplemental security income
("SSI") under Title XVI, 42 U.S.C. § 1382.  The Acting
Commissioner, in turn, moves for an order affirming her
decision.  For the reasons that follow, the decision of the
Acting Commissioner, as announced by the Administrative Law
Judge ("ALJ") is affirmed.


**I. Standard of Review**

The applicable standard of review provides, in pertinent
part:

---

[1] Claimant's last name is spelled several different ways in
the record.  The court uses the spelling that appears in her
motion to reverse the Acting Commissioner's decision.

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out standard of review for decisions

on claims for DIB); see also 42 U.S.C. § 1383(c)(3) (applying

§ 405(g) to SSI decisions).  However, the court "must uphold a

denial of social security disability benefits unless 'the

[Acting Commissioner] has committed a legal or factual error in

evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS,

76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v.

Hudson, 490 U.S. 877, 885 (1989)).

As for the standard of review that applies when an

applicant claims that an SSA adjudicator made a factual error,

> [s]ubstantial-evidence review is more deferential than
> it might sound to the lay ear:  though certainly "more
> than a scintilla" of evidence is required to meet the
> benchmark, a preponderance of evidence is not.  Bath
> Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51,
> 56 (1st Cir. 2003) (internal quotation marks omitted).
> Rather, "[a court] must uphold the [Acting
> Commissioner's] findings . . . if a reasonable mind,
> reviewing the evidence in the record as a whole, could
> accept it as adequate to support [her] conclusion."
> Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d
> 218, 222 (1st Cir. 1981) (per curiam).

Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

In addition, "'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Acting Commissioner],' and 'the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [her], not for the doctors or for the courts.'" Id. (quoting Rodriguez, 647 F.2d at 222). Thus, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).

## II. Background

The parties have submitted a Joint Statement of Material Facts. That statement[2] is part of the court's record and is summarized here, not repeated in full.

Since April of 2014, Deoliveira's medical history has included at least five trips to emergency rooms or urgent care, and she has received treatment from approximately a dozen different medical professionals.

One of Deoliveira's trips to the emergency room took place in October of 2016, about 10 days after she was involved in a motor-vehicle accident in which she suffered a "whiplash-type

---

[2] Document no. 10.

injury and head injury posteriorly."  Administrative Transcript
(hereinafter "Tr.") 852.  She presented at the emergency room
with "a severe diffuse headache," id., which represented an
increase in severity over the moderate headaches she had been
having over the 10 days after her accident.  The medical note
generated by Deoliveira's October 2016 emergency-room visit also
states:

> Patient does give a history of prior CVA in 2008 . . .
> and final diagnosis was left ICA dissection with
> resultant complete occlusion and treated with
> anticoagulation x1 year, followed by daily aspirin.

Id.  CVA is an "[a]bbreviation for cerebrovascular accident"
Stedman's Medical Dictionary 474 (28th ed. 2006), which is "an
imprecise term for cerebral stroke," id. at 10.

On November 9, 2016, Deoliveira saw a neurologist, Dr.
Sachin Dave, who noted both her stroke and her recent motor-
vehicle accident.  His examination findings include the
following:  "CORTICAL FUNCTIONS:  alert and oriented X 3,
comprehension and language intact, speech fluent."  Tr. 1010.
Based upon his examination, he gave diagnoses of headache,
cervicalgia, and concussion syndrome, and he offered this
explanation:

"She . . . had [a motor-vehicle accident] last month with
possible head injury or concussion and whiplash type neck
injury."  Id.

In addition to the diagnoses in Dr. Dave's note, Deoliveira has received diagnoses of bilateral knee pain, osteoarthritis in both knees, fibromyalgia, inflammatory arthritis with a possible autoimmune disorder, a muscle-tension headache, acute post-traumatic headache, an acute cervical sprain, low-back pain, left ear tinnitus,[3] major depression, anxiety, and insomnia. For her physical impairments, she has been treated with ice, medication,[4] and some physical therapy. On occasion, however, she has declined to engage in physical therapy, and has declined injections for the pain associated with her physical impairments. For her mental impairments, she has been treated primarily with medication,[5] although therapy has also been prescribed.

In September of 2015, Deoliveira applied for DIB and SSI, claiming that she became disabled on April 4, 2014, as a result of fibromyalgia, lower-back pain, pain in her upper neck and head, a blood clot in her head resulting from a mild stroke,

---

[3] Tinnitus is "[p]erception of a sound in the absence of an environmental acoustic stimulus." Stedman's, supra, at 1992.

[4] She has been given prescriptions for Valium, ibuprofen, tramadol, Vicodin, Percocet, Voltaren gel, an unnamed anti-depressant, cyclobenzaprine, Soma, disease-modifying anti-rheumatic drugs, oxycodone, morphine, Zofran, and Toradol.

[5] She has been given prescriptions for diazepam, Ambien, Cymbalta, Remeron, Brintellix, Viibryd, Effexor, and Klonopin.

continuous pain, headaches, stress and anxiety, depression, and
trouble walking.  She later revised the alleged onset date of
her disability to July 18, 2015, which coincides with a visit to
urgent care for knee pain.

The record includes eight statements by medical or other
professionals that discuss Deoliveira's physical or mental
impairments, each of which was evaluated by the ALJ, and each of
which is at issue in claimant's appeal.  To avoid unnecessary
redundancy, the court will defer its description of those
statements to the discussion section of this order.

After the SSA denied Deoliveira's applications for DIB and
SSI, she received a hearing before an ALJ.  At the hearing, the
ALJ heard testimony from a vocational expert ("VE"), to whom she
posed several hypothetical questions.  First, the ALJ asked the
VE

> to consider an individual of the claimant's age,
> education, and work history [who] is limited to work
> at a light exertional level.  No climbing of ladders,
> ropes, or scaffolds.  No overhead lifting.  The work
> should not include an assembly line belt pace; no
> concentrated exposure to potential hazards – moving
> machinery, unprotected heights, things like that.

Tr. 103.  The VE testified that a person with those limitations
could not perform Deoliveira's past work as a limousine/taxi
driver, but could perform her past work as a personal attendant.
He further testified that a person with those limitations could

6

perform the unskilled jobs of school-bus monitor, fruit distributor, and counter clerk.

The ALJ asked a second hypothetical question that included this additional limitation:

> Standing and walking about half time, four hours of an eight-hour day, and the individual has the option or opportunity, because of the kind of job, to change positions, stretch, that sort of thing, two to three times an hour for a minute or 2.

Tr. 104-05. According to the VE, that additional limitation would preclude a person from performing Deoliveira's past work as a personal attendant, but would allow her to perform the unskilled jobs of information clerk, ticket taker, and parking-lot cashier, "as long as the individual would be able to maintain on-task behavior for 90 percent of the work day," Tr. 106.

After Deoliveira's hearing, the ALJ issued a decision in which she found that claimant had these severe impairments:

> degenerative joint disease of the cervical spine; residual effects of [a] remote mild cerebrovascular accident; fibromyalgia; depression; insomnia; and anxiety.

Tr. 21. Then, after finding that none of Deoliveira's impairments, either alone or in combination, met or medically equaled the severity of any of the impairments on the SSA's list of impairments that are per se disabling, the ALJ provided this assessment of Deoliveira's RFC:

> [T]he claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b)
> and 416.967(b) except she is limited to standing and
> walking four hours out of an eight-hour day; the work
> must be able to be performed seated or standing at the
> option of the employee; she cannot climb ladders,
> ropes, or scaffolds; and she cannot perform any
> overhead lifting.  Work should be unskilled and not
> include an assembly line belt pace; and she should
> have no concentrated exposure to potential hazards
> (such as moving machinery, unprotected heights, etc.).

Tr. 25.  In the end, the ALJ determined that Deoliveira was
unable to perform her past work, but could perform the jobs of
school-bus monitor, fruit distributor, information clerk, ticket
taker, and parking-lot cashier.  Consequently, the ALJ found
that Deoliveira was not under a disability from July 18, 2015,
through the date of her decision, which was February 27, 2017.

## III. Discussion

### A. The Legal Framework

To be eligible for disability insurance benefits, a person
must:  (1) be insured for such benefits; (2) not have reached
retirement age; (3) have filed an application; and (4) be under
a disability.  42 U.S.C. § 423(a)(1)(A)-(D).  To be eligible for
supplemental security income, a person must be aged, blind, or
disabled, and must meet certain requirements pertaining to
income and assets.  42 U.S.C. § 1382(a).  The only question in
this case is whether the ALJ correctly determined that

Deoliveira was not under a disability from July 18, 2015,
through February 27, 2017.

To decide whether a claimant is disabled for the purpose of
determining eligibility for either DIB or SSI, an ALJ is
required to employ a five-step sequential evaluation process.
See 20 C.F.R. §§ 404.1520 (DIB) & 416.920 (SSI).

> The steps are:  1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5
(1st Cir. 2001); citing 20 C.F.R. § 416.920).

At the first four steps in the sequential evaluation
process, the claimant bears both the burden of production and
the burden of proof.  See Purdy, 887 F.3d at 9 (citing Freeman
v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen
v. Yuckert, 482 U.S. 137, 146 (1987).  She must prove she is
disabled by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.
Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[6]  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the claimant or other witness; and
> (3) the [claimant]'s educational background, age, and
> work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690
F.2d 5, 6 (1st Cir. 1982)).

B.  Deoliveira's Claims

Deoliveira claims that the ALJ erroneously determined her
RFC by improperly:  (1) evaluating her testimony about her
symptoms; and (2) weighing the medical-opinion evidence.
Neither claim has merit.  The court considers each in turn.

1.  Claimant's Statements about her Symptoms

In her decision, the ALJ gave only partial weight to
Deoliveira's statements about her symptoms, principally pain and
memory problems.  She explained that "claimant's statements
concerning the intensity, persistence and limiting effects of
[her] symptoms are not entirely consistent with the medical

---

[6] At step five, the burden of proof shifts to the Acting
Commissioner, see Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y
of HHS, 670 F.2d 374, 375 (1st Cir. 1982)), but the Acting
Commissioner's step-five determination is not at issue here, so
there is no need to describe the mechanics of step five.

evidence and other evidence in the record." Tr. 28. According to claimant, the ALJ erred by: (1) assessing her credibility, rather than evaluating her statements about her symptoms, in violation of the guidance provided by Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (S.S.A. Mar. 16, 2016); and (2) improperly relying upon her non-compliance with treatment and a lack of substantiating objective medical evidence as reasons for discounting her statements. The court begins by outlining the applicable legal principles and then turns to Deoliveira's two claims of error.

**Legal principles.** In 2016, the SSA promulgated SSR 16-3p, which is titled "Evaluation of Symptoms in Disability Claims," and which "provide[d] guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims under Titles II and XVI of the Social Security Act." 2016 WL 1119029, at *1. Under the heading "Purpose," the SSA explained:

> [W]e are eliminating the use of the term "credibility" from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character.

Id. at *1.

SSR 16-3p also outlines a two-step evaluation process in which a decisionmaker first determines whether a claimant has a medically determinable impairment that could reasonably be

expected to produce her alleged symptoms.  Then, if a claimant

has such an impairment, the decisionmaker must evaluate the

intensity and persistence of those symptoms, and determine the

extent to which they limit the claimant's ability to perform

work-related activities.  In making that evaluation, a

decisionmaker should

> examine the entire case record, including the
> objective medical evidence; an individual's statements
> about the intensity, persistence, and limiting effects
> of symptoms; statements and other information provided
> by medical sources and other persons; and any other
> relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.  However, an "ALJ cannot

reject the veracity of the claimant's own statements . . . based

solely on the conclusion that they are unsubstantiated by the

objective medical evidence."  Tellier v. US Soc. Sec. Admin.,

Acting Comm'r, No. 17-cv-184-PB, 2018 WL 3370630, at *6 (D.N.H.

July 10, 2018) (citing 20 C.F.R. § 404.1529(c)(2); Clavette v.

Astrue, No. 10-cv-580-JL, 2012 WL 472757, at *9 (D.N.H. Feb. 7,

2012); Valiquette v. Astrue, 498 F. Supp. 2d 424, 433 (D. Mass.

2007); see also SSR 16-3p, 2016 WL 1119029, at *4.  Finally,

when evaluating the intensity and persistence of a claimant's

symptoms, the ALJ should consider the so-called Avery factors:

> (i) the claimant's daily activities; (ii) the location,
> duration, frequency, and intensity of the pain or symptom;
> (iii) any precipitating and aggravating factors; (iv) the
> effectiveness of any medication currently or previously
> taken; (v) the effectiveness of non-medicinal treatment;
> (vi) any other self-directed measures used to relieve

pain; and (vii) any other factors concerning functional
limitations or restrictions. 20 C.F.R. 404.1529(c)(3);
Childers v. Colvin, [No. 14-cv-270-JL, 2015 WL 4415129],
[at] *5 [(D.N.H. July 17, 2015)] (citing Avery v. Sec'y of
Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986)).

Tellier, 2018 WL 3370630, at *7. However, "'an ALJ need not

address every Avery factor' in [her] written decision for [her]

evaluation to be supported by substantial evidence." Id.

(quoting Ault v. Astrue, No. 10-cv-553-JL, 2012 WL 72291, at *5

(D.N.H. Jan. 10, 2012)).

**Credibility**.  Deoliveira first claims that the ALJ erred by

discounting her statements about her symptoms largely because

she had been convicted of welfare fraud.  Assuming that such a

mistake by the ALJ would be a reversible error, a proposition

for which claimant cites no authority, the ALJ did not do what

Deoliveira claims she did.  The ALJ mentioned Deoliveira's

incarceration at several points in her decision, but she did not

do so as part of either an examination of claimant's character

for truthfulness or an evaluation of the statements she made

about her symptoms.  Rather, the ALJ mentioned claimant's

incarceration in discussions of her employment record, see Tr.

25-26, and her medical history, see Tr. 27, 29-30.  But that

does not run afoul of the principle, expressed in SSR 16-3p,

that SSA decisionmakers are not to assess a claimant's

credibility or character.  See Coskery v. Berryhill, 892 F.3d 1,

6 (1st Cir. 2018) (explaining, when rejecting claimant's SSR 16-

3p argument, that "we read the ALJ to have referenced Coskery's marijuana use not for the purpose of making an assessment of Coskery's character or truthfulness, but in order to explain the basis for its finding that Coskery 'was noncompliant with treatment'").  Thus, Deoliveira's SSR 16-3p argument gives the court no cause to reverse the ALJ's decision.

**Non-compliance with treatment.**  Deoliveira next claims that the ALJ erred by discounting her statements about her symptoms on grounds that she frequently stopped taking medications she had been prescribed for her physical and mental impairments.  On this point, SSR 16-3p explains that "if [a claimant] fails to follow prescribed treatment that might improve symptoms, [the SSA] may find the alleged intensity and persistence of [her] symptoms are inconsistent with the overall evidence of record," 2016 WL 1119029, at *8.  But, the SSA "will not find [a claimant's] symptoms inconsistent with the evidence in the record on this basis without considering the possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." Id.

Deoliveira argues that the ALJ failed to properly consider, or credit, her reasons for discontinuing the medications she had been prescribed.  However, in the paragraph of her decision in which she discounted Deoliveira's statements about her symptoms, the ALJ did mention claimant's testimony that she had not gotten

much benefit from the medications she has been prescribed.  And then she continued:

> She also declines to go to physical therapy stating that she tried it once and it actually made her pain worse; but this is directly refuted by the physical therapy records provided for review, which show that she reported improvement in her pain and functional abilities; and her physical therapist noted improved range of motion as well.

Tr. 35.[7]  So, even if the ALJ had erred in her consideration of claimant's reasons for not taking various prescription medications, her reliance upon claimant's failure to pursue physical therapy, an explanation that claimant does not address in her brief, is an acceptable reason for discounting her statements about her symptoms.  See SSR 16-3p, 2016 WL 1119029, at *8.  Thus, Deoliveira's claim that the ALJ mishandled the non-compliance issue provides no basis for reversing her decision.

**Lack of objective medical evidence.**  Finally, Deoliveira argues that the ALJ's decision should be reversed because, after eliminating credibility and non-compliance, the sole basis for the ALJ's decision to discount her statements about her symptoms

_____

[7] Elsewhere in her decision, the ALJ also noted:  (1) claimant's testimony that she voluntarily missed about half of her medical appointments, see Tr. 26; (2) claimant's refusal to have cortisone or other injections to treat her pain, see Tr. 27, 31, 32; (3) her failure to undergo a recommended sleep study, see Tr. 28; and (4) and an orthopedist's refusal to see her because of multiple no-shows, see Tr. 30.

was the lack of objective medical evidence, which standing alone, is an insufficient reason for discounting a claimant's statements.  As for the legal principle on which she relies, claimant is correct.  See Tellier, 2018 WL 3370630, at *6.  But here, the ALJ did not rely solely upon the lack of objective medical evidence; she also relied upon claimant's failure to take her medications and her failure to pursue physical therapy.  Thus, Deoliveira's final claim against the ALJ's decision not to credit her statements also fails.

To sum up, Deoliveira has identified no reversable error in the ALJ's decision to discount her statements about her symptoms.

### 2.  Medical Opinions

When determining claimant's physical RFC, the ALJ gave: (1) great weight to the opinion of Dr. Ann Williams, a non-examining state-agency consultant who reviewed Deoliveira's medical records in November of 2015 and then assessed her physical residual functional capacity ("RFC");[8] (2) partial weight to an opinion that Dr. Dave expressed in a Physical

---

[8] "[R]residual functional capacity 'is the most [a claimant] can still do despite [his or her] limitations.'"  Purdy, 887 F.3d at 10 n.2 (quoting 20 C.F.R. § 416.945(a)(1), a regulation governing claims for supplemental security income that is worded identically to 20 C.F.R. § 404.1545(a), which governs claims for DIB) (brackets in the original).

Impairment Medical Source Statement he signed in December of 2016; and (3) little weight to an opinion from Dr. Michele Urban, a treating physician who signed a Physical Impairment Medical Source Statement in December of 2016. When determining claimant's mental RFC, the ALJ gave: (1) great weight to the opinions expressed in a Mental Health Evaluation Report prepared by Dr. Sherie Friedrich after she performed a consultative psychological examination in November of 2015;[9] (2) great weight to the opinion of Dr. Laura Landerman, a non-examining state-agency consultant who reviewed Deoliveira's medical records, including Dr. Friedrich's report, in December of 2015 and performed a psychiatric review technique ("PRT") assessment;[10] (3) little weight to an opinion from Dr. Michele Gunning, a treating psychiatrist who completed a Mental Impairment Questionnaire in December of 2016; (4) little weight to an opinion from Mr. Samuel Rosario, a licensed social worker who completed a Mental Impairment Questionnaire in December of 2016; and (5) little weight to a Psychological Evaluation authored by Dr. Richard Shulik after he conducted a memory evaluation in

---

[9] "A consultative examination is a physical or mental examination or test purchased for [a claimant] at [the SSA's] request." 20 C.F.R. §§ 404.1519 & 416.919.

[10] The SSA uses the PRT to evaluate the severity of mental impairments. See 20 C.F.R. §§ 404.1520a & 416.920a.

February of 2017.  Claimant challenges all eight of the ALJ's evaluations.  The court begins with the relevant law and then turns to the evaluations at issue.

a.  <u>The Relevant Law</u>

The regulations that govern the evaluation of medical opinions that apply to disability claims filed before March 27, 2017, outline a hierarchy which, as a general matter, gives the greatest weight to the opinions of treating sources, less weight to the opinions of sources who have examined but not treated a claimant, and the least weight of all to the opinions of sources who have neither treated nor examined a claimant.  <u>See</u> 20 C.F.R. §§ 404.1527(c)(1)-(2) & 416.927(c)(1)-(2).[11]  Moreover, under those regulations, if an SSA decisionmaker

> find[s] that a treating source's medical opinion on
> the issue(s) of the nature and severity of [a
> claimant's] impairment(s) is well-supported by
> medically acceptable clinical and laboratory
> diagnostic techniques, and is not inconsistent with
> the other substantial evidence in [the claimant's]
> case record, [the decisionmaker] will give it
> controlling weight.

20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).  On the other hand, however, "nothing precludes an ALJ from giving greater weight to the opinion of a non-treating physician than that of a treating source where the former is supported by substantial evidence."

---

[11] For claims filed on or after March 27, 2017, different regulations apply.  <u>See</u> 20 C.F.R. §§ 404.1520c & 416.920c.

*Nichols v. US Soc. Sec. Admin., Acting Comm'r*, No. 16-cv-443-PB,
2018 WL 1307645, at *12 (D.N.H. Mar. 13, 2018) (citing *Tetreault
v. Astrue*, 865 F. Supp. 2d 116, 124 (D. Mass. 2012); *Diaz v.
Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)).

When a decisionmaker does not give controlling weight to
the opinion of a treating source, she must evaluate it, and all
the other medical opinions in the record, by considering the
following factors:  (1) the length of the treatment relationship
and the frequency of examination; (2) the nature and extent of
the treatment relationship; (3) the degree to which the source
provides support for his or her opinion in the form of medical
signs and laboratory findings; (4) the consistency of the
opinion with the record as a whole; (5) the specialization of
the source; and (6) other factors, including the source's
familiarity with the SSA's disability programs.  See 20 C.F.R.
§§ 404.1527(c)(2)-(6) & 416.927(c)(2)-(6).  Finally, "when an
ALJ does not give controlling weight to the opinion of a
treating source, [she] must give good reasons for the amount of
weight [she] does give it."  *Swain v. Berryhill*, No. 18-cv-145-
PB, 2018 WL 5342714, at *5 (D.N.H. Oct. 29, 2018) (citing 20
C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2)).  To satisfy that
requirement,

the ALJ's reasons must be both specific, see *Kenerson
v. Astrue*, No. 10-cv-161-SM, 2011 WL 1981609, at *4
(D.N.H. May 20, 2011) (citation omitted), and

supportable, see Soto-Cedeño v. Astrue, 380 Fed. Appx.
1, 4 (1st Cir. 2010).  In sum, the ALJ's reasons must
"offer a rationale that could be accepted by a
reasonable mind."  Widlund v. Astrue, No. 11-cv-371-
JL, 2012 WL 1676990, at *9 (D.N.H. Apr. 16, 2012)
(citing Lema v. Astrue, C.A. No. 09-11858, 2011 WL
1155195, at *4 (D. Mass. Mar. 21, 2011)), report and
recommendation adopted by 2012 WL 1676984 (D.N.H. May
14, 2012).

Jenness v. Colvin, No. 15-cv-005-LM, 2015 WL 9688392, at *6
(D.N.H. Aug. 27, 2015).

### b.   Opinions on Claimant's Physical RFC

**Dr. Williams.**  In her RFC assessment, Dr. Williams
determined that Deoliveira could lift and/or carry 10 pounds
frequently and 20 pounds occasionally, stand and/or walk (with
normal breaks) for about six hours in an eight-hour workday, sit
(with normal breaks) for about six hours in an eight-hour
workday, and push and/or pull same amount she could lift and/or
carry.  Dr. Williams did not identify any postural,
manipulative, visual, communicative, or environmental
limitations.

The ALJ gave Dr. Williams's opinion great weight because of
her familiarity with the SSA's disability programs and because
her opinion was "not inconsistent with the medical evidence as a
whole," Tr. 41.  She then continued:

> Although the undersigned has determined that the
> claimant has some residual functional deficits
> associated with her mild stroke and has therefore
> included this as a severe impairment with associated
> limitations in her ability to perform skilled or paced

work, there has been no convincing evidence submitted
since the medical assessments were completed that now
warrants finding greater physical limitations.

<u>Id.</u>

Claimant challenges the AJL's evaluation of Dr. Williams's
opinion, arguing that:  (1) the ALJ produced no evidence of Dr.
Williams's knowledge of the SSA's disability programs; and (2)
the ALJ's determination that there was no evidence post-dating
Dr. Williams's opinion that supported greater limitations is
based upon an erroneous evaluation of the opinions of Dr. Dave
and Dr. Urban.  However, claimant does not identify any
particular aspect of Dr. Williams's RFC assessment with which
she takes issue.

Deoliveira's claims are unavailing.  First, Dr. Williams's
undisputed status as a state-agency consultant, and the content
of her RFC assessment, satisfy the court that she is familiar
with the SSA's disability programs which, in turn, is a factor
that the regulations specifically direct SSA decisionmakers to
consider when evaluating medical opinions, <u>see</u> 20 C.F.R. §§
404.1527(c)(6) & 416.927(c)(6).  And, for reasons discussed
below, the court cannot agree that the ALJ erred in her
evaluation of the other two medical opinions on claimant's
physical RFC.  Accordingly, the court finds no fault with the
ALJ's evaluation of Dr. Williams's opinion.

**Dr. Dave.** In his Medical Source Statement, Dr. Dave noted that he had seen Deoliveira once, on November 9, 2016,[12] and he listed a single diagnosis: concussion. When asked to "[i]dentify the clinical findings and objective signs," Tr. 740, of claimant's impairment, he wrote: "no focal weakness," id. While he made some marginal notes on the form he filled out, he did not answer many of the questions on it, and he only identified two actual limitations, opining that: (1) Deoliveira's experience of pain or other symptoms would frequently interfere with the attention and concentration needed to perform even simple work tasks; and (2) it was very likely that Deoliveira would sometimes need to take unscheduled breaks during an eight-hour workday. He did not, however, respond to the questions about the frequency of Deoliveira's need for breaks or the duration of the breaks she needed. Claimant relies upon Dr. Dave's opinion that during a typical workday, her experience of pain or other symptoms would frequently be "severe enough to interfere with attention and concentration needed to perform even simple work tasks." Tr. 741.[13]

---

[12] The record, however, also includes an October 31, 2013, consultation note, which indicates that Dr. Dave saw claimant on that date, and had previously seen her, for an initial visit, in February of 2012. See Tr. 669-70.

[13] The court assumes that such a limitation would preclude all work, even though claimant's counsel did not elicit any VE testimony to that effect at her hearing. See Bolobanic v.

The ALJ gave that opinion only partial weight because it was not well supported and because it was only partially consistent with the record as a whole. The ALJ's consistency rationale, in turn, starts with Dr. Dave's reliance upon claimant's subjective complaints, and then turns to the lack of support for those complaints in the objective medical record.

Claimant disagrees with the ALJ's evaluation of Dr. Dave's opinion, but rather than addressing the ALJ's supportability rationale, she merely points to the ALJ's purportedly erroneous assessment of her statements about her symptoms. Because the ALJ did not err in his evaluation of claimant's statements about her symptoms, however, for the reasons explained above, claimant's challenge to the ALJ's evaluation of Dr. Dave's opinion fails to persuade.

Moreover, the ALJ's supportability rationale is a good reason for discounting Dr. Dave's opinion. Supportability by medical signs is one of the factors that SSA decisionmakers are directed to consider when weighing medical opinions. See 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3). The only medical sign that Dr. Dave presented to support his opinion is "no focal

Astrue, No. 11-cv-441-PB, 2012 WL 2049382, at *4 (D.N.H. May 21, 2012) (noting VE testimony that there would be no jobs available for a person who had pain or other symptoms that frequently or constantly interfered with the attention and concentration needed to perform even simple work tasks), R. & R. adopted by 2012 WL 2046326 (June 5, 2012).

weakness," Tr. 740, but there is nothing in Dr. Dave's opinion that explains how "no focal weakness" is a medical sign that would support a finding that a person who exhibits that sign would frequently be distracted by pain or other symptoms. Accordingly, the ALJ did not err in her decision to discount Dr. Dave's opinion as inadequately supported.

**Dr. Urban.** In her Medical Source Statement, Dr. Urban indicated that she had seen Deoliveira four times over the previous year. She listed the following diagnoses: concussion syndrome, severe anxiety/depression, attention deficit hyperactivity disorder, inflammatory arthritis, fibromyalgia, mild degenerative arthritis in knees, left ICA dissection,[14] and spondylosis of the cervical spine.[15] When asked to "[i]dentify the clinical findings and objective signs," Tr. 1012, of claimant's impairments, she wrote: "see attached office note," id. However, there is no office note attached to the copy of Dr. Urban's Medical Source Statement that appears in the record. Moreover, Dr. Urban did not answer any of the questions on the

---

[14] ICA is an "[a]bbreviation for internal carotid artery." Stedman's, supra, at 942 (emphasis omitted).

[15] Spondylosis is "[a]nkylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedman's, supra, at 1813. Ankylosis is "[s]tiffening or fixation of a joint as a result of a disease process, with fibrous or bony union across the joint; fusion." Id. at 95.

form regarding Deoliveira's physical RFC, stating that
Deoliveira needed a functional capacity evaluation.[16]  Like Dr.
Dave, however, Dr. Urban opined that Deoliveira's experience of
pain or other symptoms would frequently interfere with the
attention and concentration needed to perform even simple work
tasks.  That is the opinion on which claimant relies.

The ALJ gave that opinion little weight because Dr. Urban:
(1) did "not set forth any narrative explanation for [that]
conclusion," Tr. 38; (2) stated that claimant was taking
multiple pain medications and muscle relaxants when, in fact,
she was not; and (3) "acknowledge[d] that she [was] not
qualified to comment on either the claimant's mental
functioning, or her physical capabilities," Tr. 38.

Claimant disagrees with the ALJ's evaluation of Dr. Urban's
opinion.  She challenges the ALJ's supportability findings by
arguing that those

> findings disregard the specific descriptions of Ms.
> Deoliveira's symptoms and pain provided by Dr. Urban,
> which are adequately extensive to support her opinion
> that Ms. Deoliveira's pain symptoms would frequently

---

[16] Dr. Urban referred claimant to an occupational therapist,
Joan Van Saun, for a functional capacity evaluation.  After
noting that "there were significant discrepancies between
[claimant's] reported and her demonstrated functional
abilities," Tr. 1020, Van Saun determined that "it [was] not
possible to predict with accuracy the work capacity of a patient
with this profile, i.e., significant pain behaviors,
inconsistency of effort [and] inconsistency between reported and
demonstrated functional abilities," Tr. 1021.

interfere with her ability to perform even simple work.  (Tr. 1012-12).

Cl.'s Mem. of Law (doc. no. 8-1) 9.  With respect to the ALJ's second reason for discounting Dr. Urban's opinion, claimant argues that the ALJ erred because "the record is replete with medical records and testimony that [she] attempted treatment of her chronic pain with numerous pain medications and muscle relaxants that were discontinued due to the side effects that they caused." Id. at 8.  Claimant does not appear to challenge the ALJ's third reason for discounting Dr. Urban's opinion.  In any event, the ALJ's first two rationales are both good reasons for discounting Dr. Urban's opinion.

Turning to the ALJ's supportability rationale, Dr. Urban's Medical Source Statement does document some descriptions of Deoliveira's symptoms, as claimant suggests, but the supportability inquiry focusses on "medical signs and laboratory findings," 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3), not a claimant's subjective complaints.  In the portion of the form that asked her to "[i]dentify . . . clinical findings and objective signs," Tr. 1012, Dr. Urban referred to an "attached" but otherwise unidentified office note that was not attached to her Medical Source Statement.  Beyond that, as best the court can tell from the record, when Dr. Urban completed her Medical Source Statement, she had last seen Deoliveira in October of

2016.  See Tr. 813-14.  If Dr. Urban's October 24, 2016,
progress note is the office note to which she referred in her
Medical Source Statement, it is not at all clear how that note
provides support for a finding that Deoliveira suffered from
pain that affected her attention and concentration to the point
where she was unable to work.  While Dr. Urban's examination
revealed some pain on palpation, she also reported that
Deoliveira was "in no acute distress," Tr. 813.  Neither the
clinical findings noted above nor anything else in the October
2016 progress note appears to support the limitation in Dr.
Urban's Medical Source Statement on which claimant relies, i.e.,
that she would be frequently distracted by pain or other
symptoms.

The ALJ's second rationale, Dr. Urban's apparent
misunderstanding of the medical record, is also a good reason
for discounting her opinion.  When asked to describe claimant's
"treatment and response including any side effects of
medication," Tr. 1012, Dr. Urban said that claimant was then "on
multiple medications," id. (emphasis added), and, necessarily,
her opinion rested upon that understanding of the record.  When
the ALJ challenged Dr. Urban's understanding of the record by
pointing out that claimant was not actually taking all that many
medications (because she had stopped taking several of the
medications she had been prescribed) claimant's response was not

to say that she was actually taking multiple medications, as Dr. Urban had said.  Rather, she faulted the ALJ for failing to acknowledge the reasons why she had stopped taking her prescribed medications.  The record may well include medical records that document claimant's explanations for why she stopped taking various medications, but the fact remains that Dr. Urban appears not to have taken any such records into account when forming her opinion, given her statement that claimant was taking many medications.  The inconsistency between Dr. Urban's understanding of the medical record and the actual state of that record, as characterized by claimant herself, is another good reason for discounting Dr. Urban's opinion.

In sum, the ALJ did not err by giving Dr. Urban's opinion little weight.

c.  Fibromyalgia

At the end of her discussion of the ALJ's evaluation of the opinions provided by Dr. Dave and Dr. Urban, Deoliveira claims that because the ALJ found that her fibromyalgia was a severe impairment, she "erroneously evaluated the opinion evidence of record based upon a lack of objective medical evidence to substantiate her claimed chronic pain symptoms and limitations." Cl.' Mem. of Law (doc. no. 8-1).  But in the discussion that follows the foregoing claim, Deoliveira quotes from, and takes issue with, two statements that appear in the portion of the

ALJ's decision that is devoted not to her evaluation of the medical-opinion evidence but to her assessment of claimant's statements about her symptoms.  Thus, the actual gravamen of claimant's fibromyalgia argument is somewhat murky.

If Deoliveira is claiming that her fibromyalgia diagnosis and/or the ALJ's determination that her fibromyalgia was a severe impairment compelled the ALJ to credit Dr. Urban's opinion that her pain would frequently interfere with the concentration and attention needed to perform simple work tasks, she is mistaken.[17]  As the court has noted, the ALJ discounted Dr. Urban's opinion in part because she did not "present[] relevant evidence to support [it], particularly medical signs and laboratory findings," 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3).  It is true that Dr. Urban did list a diagnosis of fibromyalgia on her Medical Source Statement.  But, a review of Dr. Urban's progress notes reveals that while she acknowledged a previous diagnosis of fibromyalgia by Dr. John Haley,[18] she never made such a diagnosis on her own, and her notes do not show findings that would satisfy the diagnostic

_____

[17] Given that Dr. Dave did not even identify fibromyalgia as a diagnosis on his Medical Source Statement, nothing the ALJ did or did not do with respect to fibromyalgia could have led to any error in evaluating Dr. Dave's opinion.

[18] Dr. Haley diagnosed Deoliveira with fibromyalgia and treated her for it, but also noted that his "[d]iagnosis [was] by no means certain," Tr. 630.

criteria for fibromyalgia adopted by the SSA, see Maynard v. Berryhill, No. 17-cv-087-PB, 2018 WL 839994, at *5 (D.N.H. Feb. 13, 2018) (quoting SSR 12-2p, 2012 WL 3104869, at *3-4 (S.S.A. July 25, 2012)). Thus, claimant's invocation of fibromyalgia adds nothing to the analysis that would undermine the ALJ's decision to discount Dr. Urban's opinion as inadequately supported.

If, on the other hand, Deoliveira is claiming that her fibromyalgia diagnosis and/or the ALJ's determination that her fibromyalgia was a severe impairment compelled the ALJ to credit her statements about disabling pain, she is also mistaken. In Johnson v. Astrue, on which claimant bases her fibromyalgia argument, the court of appeals pointed out that "[t]he primary symptom of fibromyalgia . . . is chronic widespread pain," 597 F.3d 409, 414 (1st Cir. 2009), and explained that

> once the ALJ accepted the diagnosis of fibromyalgia, she also "had no choice but to conclude that the claimant suffer[ed] from the symptoms usually associated with [such condition], unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms,"

id. (quoting Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994)) (emphasis and brackets added by Johnson). Here, when discounting claimant's statements about her symptoms, the ALJ identified substantial evidence in the record to support a finding that her pain was not as great as she claimed it was,

that evidence being claimant's refusal to engage in physical therapy on grounds that it made her symptoms worse, notwithstanding physical therapy records demonstrating the opposite. Thus, Johnson did not compel the ALJ to credit claimant's statements about the limiting effects of her fibromyalgia pain.

In sum, there is nothing about claimant's diagnosis of fibromyalgia, or the First Circuit's decision in Johnson, that moves this court to find that the ALJ erred in her evaluation of Dr. Urban's opinion or her assessment of claimant's statements about her symptoms.

### d. Opinions on Claimant's Mental RFC

**Dr. Friedrich**. After performing her consultative examination, which she characterized as a comprehensive psychological profile, Dr. Friedrich produced a Mental Health Evaluation Report. In it, she described the results of a six-part mental status examination that included a section titled "Sensorium of Functions," Tr. 712. Under that heading, Dr. Friedrich reported:

> Alert and oriented to season, month, day of week, date, and year. Oriented to city, state, county, and setting. Able to read, write, and repeat a simple sentence. Able to copy a simple geometric design. Able to perform 5 of 5 serial sevens. Able to recall 1 of 3 words after a five minute delay. Able to spell the word "world" backward.

Tr. 713.  With respect to Deoliveira's then-current level of functioning, Dr. Friedrich provided the following findings:

**a. Activities of Daily Living:** . . . [T]he claimant is able to complete most activities of daily living.  She tends to her grooming and hygiene, showering every other day and dressing into clean clothing daily.  She is able to prepare meals.  The claimant drives herself where she needs to go and runs errands and grocery shops as needed.  She performs basic household tasks.  The claimant manages her own finances and personal affairs.

**b. Social Functioning:** . . . [T]he claimant is able to interact appropriately with others.  She was cooperative during the evaluation and behaved appropriately.  She denies ongoing conflicts with others.  Her communications skills were fair.  There is no evidence of impairment in this domain.

**c. Understanding and Remembering Instructions:** . . . [T]he claimant is able to understand locations and work-like procedures and follow through with simple instructions.  She was able to follow simple instructions during the evaluation.  There is no evidence to suggest that the claimant is unable to follow work-like procedures.

**d. Concentration and Task Completion:** . . . [T]he claimant is able to maintain attention and concentration and complete tasks.  She worked at a reasonable pace during the evaluation.  She is able to complete tasks at home.  She was able to concentrate to spell the word "world" backwards and to complete five of five serial sevens.  There is no psychological evidence of impairment in this domain.

**e. Reaction to Stress, Adaptation to Work or Work-like Situations:** . . . [T]he claimant is able to tolerate most stressors common to a work setting.  She is able to maintain a daily schedule and routine.  The claimant can make simple decisions for herself and has fair judgment.  Based on her presentation today, I believe she could interact appropriately with supervisors.

Tr. 714-15 (emphasis added).

The ALJ gave Dr. Friedrich's opinion great weight because it was "consistent with the neurology records provided for review, which demonstrate[d] no cognitive deficits whatsoever," Tr. 41, and further explained that the treatment records post-dating Dr. Friedrich's examination, by Dr. Gunning and Mr. Rosario, "contain no objective evidence of greater mental limitations than those described by Dr. Friedrich in her November 2015 report," id. In addition, because of claimant's "mild difficulty with delayed recall," Tr. 41, as demonstrated by her performance on Dr. Friedrich's mental status examination, the ALJ included a limitation to unskilled work in claimant's RFC.

Claimant disagrees with the ALJ's evaluation of Dr. Friedrich's opinion, which she characterizes as a determination that she "had essentially no limitations in her ability to perform simple work," Cl.'s Mem. of Law (doc. no. 8-1) 13. Rather than challenging the ALJ's determination that Dr. Friedrich's opinion was consistent with the neurology records, claimant argues that the ALJ erred in giving great weight to that opinion because

> Dr. Friedrich performed no extensive psychological testing during her exam and noted that [she] was able to recall only one of three words after a five-minute delay, consistent with the objective memory testing later performed by Dr. Shulik and inconsistent with

33

the ALJ's finding of only "mild difficulty with delayed recall." (Tr. 41, 713).

Id. Claimant has given the court no reason to reverse the ALJ's decision based upon her determination that Dr. Friedrich's opinion was entitled to great weight.

To cast Deoliveira's claim in terms of the regulations that govern the evaluation of medical-opinion evidence, she appears to claim that the ALJ erroneously credited Dr. Friedrich's opinion that she was capable of following simple instructions because Dr. Friedrich did not adequately support that opinion, see 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3) or because it was inconsistent with the record as a whole, see 20 C.F.R. §§ 404.1527(c)(4) & 416.927(c)(4). Neither part of that claim is persuasive.

First, Dr. Friedrich did provide support for her opinion.[19] Specifically, she reported the results of her mental status examination, which included seven items related to memory, six of which Deoliveira handled with no problem. See Tr. 713. And, Dr. Friedrich further supported her opinion that Deoliveira could follow simple instructions with her own observation that Deoliveira "was able to follow simple instructions during the

---

[19] In the same sentence in which she says that Dr. Friedrich failed to conduct extensive psychological testing, claimant reports one of seven results from one part of Dr. Friedrich's six-part mental status examination.

evaluation," Tr. 713.  Thus, the ALJ did not err by failing to discount Dr. Friedrich's opinion due to a lack of support.

As for consistency with the record as a whole, Deoliveira claims that the ALJ's finding that she "demonstrated [only] mild difficulty with delayed recall," Tr. 41, is inconsistent with both the results of Dr. Friedrich's mental status examination and Dr. Shulik's more extensive memory testing.  However, she does not seem to argue that Dr. Friedrich's opinion that she could follow simple instructions was inconsistent with anything in the record as a whole.  Moreover, there appears to be no evidence in the record to support a finding that claimant was not capable of following simple instructions.  Dr. Shulik's psychological evaluation documents severe memory problems, but does not express Dr. Shulik's clinical findings in functional terms, so there is no basis for finding that Dr. Friedrich's opinion is inconsistent with Dr. Shulik's findings.  In short, like her supportability claim, Deoliveira's consistency claim gives the court no reason to reverse the ALJ's decision based upon her determination that Dr. Friedrich's opinion was entitled to great weight.

**Dr. Landerman.**  Based upon her review of Deoliveira's medical records, Dr. Landerman found that Deoliveira had:  mild restrictions on her activities of daily living, mild difficulties in maintaining social functioning, mild

difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration. Based upon those findings, Dr. Landerman determined that Deoliveira had no severe mental impairments.

The ALJ gave Dr. Landerman's opinion great weight because of her familiarity with the SSA's disability programs and because her opinion was "not inconsistent with the medical evidence as a whole," Tr. 41. Deoliveira's only real claim is that the ALJ produced no evidence of Dr. Landerman's knowledge of the SSA's disability programs, but for the same reasons that apply to Dr. Williams's opinion, stated above, that claim is also unavailing as to Dr. Landerman's opinion. Beyond that, claimant does not identify any particular aspect of Dr. Landerman's opinion with which she takes issue. And, indeed, Dr. Landerman merely opined that Deoliveira did not have a listing-level mental impairment, and Deoliveira does not claim that she did.

In sum, the ALJ's evaluation of Dr. Landerman's opinion provides no basis for reversing her decision.

**Dr. Gunning.** In her Mental Impairment Questionnaire, Dr. Gunning: (1) stated that she had seen Deoliveira six times during the course of the year; (2) listed diagnoses that include anxiety, major depression, and insomnia; (3) identified "anxiety, depressive symptoms, and insomnia," Tr. 745, as

"clinical findings including results of mental status examination that demonstrate[d] the severity of [claimant's] mental impairment and symptoms," id. (emphasis added); and (4) described Deoliveira's prognosis as "guarded due to her physical issues & poorly controlled pain," id.  The form that Dr. Gunning completed also asked her to indicate the symptoms of Deoliveira's mental impairments.  She checked the boxes for anhedonia or pervasive loss of interest in almost all activities, decreased energy, generalized persistent anxiety, mood disturbances, difficulty thinking or concentrating, and sleep disturbance, but she did not check the box for "[m]emory impairment – short, intermediate, or long term," Tr. 746.

Like Dr. Landerman, Dr. Gunning found that Deoliveira had: mild restrictions, or none at all, on her activities of daily living; mild difficulties, or none at all, in maintaining social functioning; mild difficulties, or none at all, in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration.

With respect to the 16 mental abilities and aptitudes needed to do unskilled work, Dr. Gunning rated Deoliveira as unlimited or very good in two of them, including the ability to maintain regular attendance and be punctual within customary, usually strict tolerances.  She rated Deoliveira as limited but satisfactory in ten abilities, including the abilities to:  (1)

remember work-like procedures; (2) understand and remember very short and simple instructions; and (3) carry out very short and simple instructions.  Finally, Dr. Gunning rated Deoliveira as seriously limited but not precluded in the remaining four abilities:  (1) completing a normal workday and workweek without interruptions from psychologically based symptoms; (2) performing at a consistent pace without an unreasonable number and length of rest periods; (3) responding appropriately to changes in a routine work setting; and (4) dealing with normal work stress.  Finally, there were no abilities for which Dr. Gunning gave Deoliveira either of the two lowest ratings available, i.e., "unable to meet competitive standards," and "no useful ability to function."  When asked to explain her determination that claimant had serious limitations on four abilities and to "include the medical/clinical findings that support this assessment," Tr. 748, Dr. Gunning wrote:  "prone to high anxiety which can affect function when under stress," id.

With respect to the four mental abilities and aptitudes needed to do semiskilled and skilled work, Dr. Gunning rated Deoliveira as unlimited or very good in one of them and as

limited but satisfactory in the other three, including the ability to understand and remember detailed instructions.[20]

Finally, Dr. Gunning found that Deoliveira would be absent from work about two days a month due to her impairments or treatment for them. At claimant's hearing, the VE testified that "[t]ypically one unexcused absence per month is tolerated," Tr. 106, but did not offer any testimony on the number of absences per month that are typically excused, through the use of leave time, so it is not entirely clear that a need for two absences per month would result in more than one unexcused absence per month. However, the court will presume that the limitation at issue would preclude employment.

The ALJ gave Dr. Gunning's opinions little weight because: (1) she did not provide clinical findings to support them, but, instead, answered a question about clinical findings by listing mere diagnoses; (2) she ventured outside her practice area by offering an opinion on the effect of pain on claimant's mental RFC; (3) her opinions were internally inconsistent;[21] and (4) she

_____

[20] In addition, with respect to the mental abilities and aptitude needed to do particular types of jobs, Dr. Gunning rated Deoliveira as unlimited or very good in all five.

[21] The purported inconsistency stems from the fact that Dr. Gunning found that claimant had only mild "limitations in the [broad] areas of performing activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace," Tr. 37, but also found that she had serious limitations the specific abilities to: (1) complete a

39

offered no explanation for her opinion that claimant would be absent from work about two days per month.  Deoliveira takes issue with each of the reasons the ALJ gave for discounting Dr. Gunning's opinions.

For the sake of argument, the court will presume that the ALJ's second and third reasons for discounting Dr. Gunning's opinions are not good reasons.[22]  However, her first and fourth reasons, taken together, present a supportability rationale that could be accepted by a reasonable mind as sufficient to support her determination that Dr. Gunning's opinions were entitled to little weight.

As the court has noted, Dr. Gunning identified:  (1) "anxiety, depressive symptoms, and insomnia" as "clinical findings . . . demonstrate[ing] the severity of [claimant's] mental impairment and symptoms," Tr. 745; and (2) "high anxiety . . . when under stress" as "medical/clinical findings" that

_____

normal workday and workweek; (2) perform at a consistent pace; (3) respond appropriately to changes in a routine work setting; and (4) deal with normal work stress.

[22] With regard to the third reason, a purported internal inconsistency in Dr. Gunning's opinion, given that Dr. Gunning found at least satisfactory functioning in 21 of 25 specific mental abilities and aptitudes listed on her questionnaire, see Tr. 747-48, it is hardly clear that she created an inconsistency by finding mild or no limitations in the three broad categories of activities of daily living, social functioning, and maintaining concentration, persistence, or pace, see Tr. 749.

supported her determination that claimant had serious
limitations in four of the sixteen mental abilities and
aptitudes necessary to do unskilled work.  In response to the
ALJ's supportability rationale for discounting Dr. Gunning's
opinion, claimant argues:

> [R]egarding the ALJ's finding that Dr. Gunning did not
> offer sufficient explanation to support her opinion of
> specific serious limitations, Dr. Gunning also wrote
> that Ms. Deoliveira was "prone to high anxiety which
> can affect function when under stress" to explain her
> opinion of serious limitations in the four identified
> areas.  . . .  The ALJ also erroneously found that Dr.
> Gunning did not offer any explanation for her opinion
> that Ms. Deoliveira would be absent from work about
> two days per month due to her impairments or
> treatment, because as noted previously Dr. Gunning
> explained that periods of high anxiety would affect
> her functioning to a greater extent when present – Dr.
> Gunning's opinion regarding the number of absences
> that Ms. Deoliveira was likely to have in a month due
> to her impairments is consistent with her opinion of
> serious limitations in her ability to complete a
> normal workday or workweek without interruptions and
> to perform at a consistent pace without an
> unreasonable number and length of rest periods.  Dr.
> Gunning's opinion is also consistent with her
> treatment notes . . .

Cl.'s Mem. of Law (doc. no. 8-1) 5-7.[23]

While claimant restates what Dr. Gunning wrote on her
Mental Impairment Questionnaire, she does not really explain how
those responses count as "medical signs [or] laboratory
findings," 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3), that

---

[23] Claimant does not mention Dr. Gunning's opinion that she
had an unlimited or very good ability to maintain regular
attendance and be punctual within strict tolerances.

support the functional limitations she identified in her opinion. For her part, the Acting Commissioner says that the notations on which claimant relies do little more than name diagnoses, and argues that a diagnosis alone is insufficient to qualify as support for a medical opinion for the purposes of 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3). The court agrees.

In Whitney v. Berryhill, a treating source found various limitations on a claimant's exertional capacity. Then he

> attributed the exertional limitations that he assessed
> to the plaintiff's morbid obesity, "severe
> osteoarthritis knees, shoulder and probably hip—
> limited exertional capacity and poorly controlled
> diabetes with neuropathy" [and] elaborated with
> respect to her knee impairments: "Her knees are
> basically shot and would benefit from total knee
> replacements."

No. 1:16-cv-00354-JAW, 2017 WL 2839632, at *8 (D. Me. July 2, 2017) (citation to the record omitted). The ALJ in Whitney gave the treating source's opinion only partial weight, because the extent of the limitations he found was not explained in his opinion or supported by his treatment records. See id. The court affirmed, and explained:

> Dr. Shannon primarily identified diagnoses in support
> of his findings; however, as the commissioner points
> out, the diagnosis of a condition, without more, fails
> to inform a fact-finder about a condition's severity,
> see, e.g., Brown v. Colvin, No. 2:13-cv-473-JHR, 2015
> WL 58396, at *2 (D. Me. Jan. 5, 2015) (a diagnosis,
> alone, does not establish a condition's severity).

Id. at *9 (citation to the record omitted).  Just as Dr.
Shannon's identification of diagnoses was insufficient to
support his opinions in Whitney, Dr. Gunning's failure to do
anything more than list diagnoses as explanations for the
limitations she identified gave the ALJ a good reason to
discount her opinion.

Because the ALJ did not err in her evaluation of Dr.
Gunning's opinion, that aspect of her decision gives the court
no basis for reversing it.

**Mr. Rosario.**  In his Mental Impairment Questionnaire, Mr.
Rosario:  (1) stated that he had been seeing Deoliveira for
about seven months; (2) listed diagnoses that include anxiety
and major depression; (3) identified "Anxiety, Depression, ↑
pain," Tr. 752, as "clinical findings . . . that demonstrate[d]
the severity of [claimant's] mental impairment and symptoms,"
id. (emphasis added); and (4) described Deoliveira's prognosis
as "guarded due to physical problems struggles with controlling
pain – multiple medical issues," id.

Mr. Rosario found that Deoliveira had:  mild restrictions,
or none at all, on her activities of daily living; mild
difficulties, or none at all, in maintaining social functioning;
moderate difficulties in maintaining concentration, persistence
or pace; and no repeated episodes of decompensation, each of
extended duration.

With respect to the mental abilities and aptitudes needed to do unskilled work, semiskilled work, and particular types of jobs, Mr. Rosario's responses mirrored those of Dr. Gunning. When asked to explain his determination that claimant had serious limitations on four abilities and to "include the medical/clinical findings that support this assessment," Tr. 755, Mr. Rosario wrote: "Struggles with anxiety, agitation + frustration due to stress + chronic pain," id. Finally, like Dr. Gunning, Mr. Rosario found that Deoliveira would be absent from work about two days a month due to her impairments or treatment for them.

The ALJ gave Mr. Rosario's opinions little weight because he: (1) did not provide clinical findings to support them, but merely stated various diagnoses; (2) offered no explanation for his opinion that claimant would be absent from work about two days per month; and (3) is not an acceptable medical source. Mr. Rosario provided no better support for his opinions than Dr. Gunning provided for hers. For that reason, and because Mr. Rosario is not an acceptable medical source, see 20 C.F.R. §§ 404.1513 (2016) & 416.913 (2016) defining the term "acceptable medical sources" in a way that excludes social workers); SSR 06-03p, 2006 WL 2329939, at *5 (S.S.A. Aug. 9, 2006) ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight

than an opinion from a medical source who is not an 'acceptable medical source . . . .'"), the ALJ's determination that Mr. Rosario's opinion deserved little weight gives the court no reason to reverse her decision.

**Dr. Shulik.** Dr. Gunning referred Deoliveira to Dr. Shulik for a memory evaluation. Dr. Shulik, in turn, administered the Wechsler Abbreviated Scale of Intelligence (Second Edition), on which Deoliveira exhibited a "normal profile," Tr. 1023, and the Wide Range Assessment of Memory and Learning – Second Edition, on which Deoliveira exhibited a "weak profile," id. According to Dr. Shulik, Deoliveira's "over-all score for the [memory] test . . . place[d] her within the first percentile among her peers in terms of general memory functioning." Id. He then diagnosed Deoliveira with a "[m]ajor neurocognitive disorder secondary to stroke and head injuries." Tr. 1024. Under the heading "Discussion and Recommendations," he elaborated:

> Ms. deOlivera's deficits seem to be genuine. . . .
> [S]he has put forth her best efforts in the context of
> this evaluation: [I have] no reason to believe that
> her low scores within the memory test battery
> represent feigning or malingering. Moreover . . . Ms.
> deOlivera's memory deficits are of major proportions.
> They are consistent with her reports that she is
> unable to work at this time.

Tr. 1024.

The ALJ began her assessment of Dr. Shulik's evaluation by noting that Dr. Shulik "offered no opinion on the claimant's

ability to perform specific work-related mental activities."
Tr. 39. Then, she gave Dr. Shulik's evaluation little weight
because: (1) his finding of a severe memory deficit was
inconsistent with the record as a whole, including both medical
and non-medical evidence; and (2) the evaluation was based on "a
one-time examination with findings not described anywhere else
in [claimant's] neurology or mental health treatment records,"
Tr. 40, and was "more akin to an advocacy opinion," id. In
addition, the ALJ pointed out that while Dr. Shulik did not
suspect that Deoliveira's low scores resulted from feigning or
malingering, Joan Van Saun had reported inconsistent effort on
the functional capacity assessment she had administered, and
several treating sources had noted extensive non-compliance with
treatment. For her part, claimant offers a point-by-point
refutation of the reasons the ALJ gave for discounting Dr.
Shulik's evaluation.

While the ALJ and the parties have devoted considerable
attention to Dr. Shulik's evaluation, that evaluation, as the
ALJ correctly pointed out, "offered no opinion on the claimant's
ability to perform specific work-related mental activities," Tr.
39. For that reason, Dr. Shulik's evaluation is not a medical
opinion. The applicable regulations define "medical opinions"
as

> statements from acceptable medical sources that
> reflect judgments about the nature and severity of [a
> claimant's] impairment(s), including [her] symptoms,
> diagnosis and progress, what [she] can still do
> despite impairment(s), and [her] physical or mental
> restrictions.

20 C.F.R. §§ 404.1527(a)(1) & 416.927(a)(1). While Dr. Shulik's

evaluation includes various test results, it contains relatively

little in the way of judgments about the severity or functional

effects of claimant's mental impairment(s). To be sure, Dr.

Shulik stated that claimant's memory deficits were "consistent

with her reports that she [was] unable to work at [that] time."

Tr. 1024. That, however, is not a medical opinion; it is an

opinion on an issue reserved to the commissioner, see 20 C.F.R.

§§ 404.1527(d)(1) & 416.927(d)(1), and as such, it is not

entitled to "any special significance," 20 C.F.R. §§

404.1527(d)(3) & 416.927(d)(3). Indeed, if the ALJ had used the

test results from Dr. Shulik's evaluation as the basis for

determining claimant's mental RFC, she would have bumped into

the well-established principle that "an ALJ, as a lay person,

cannot interpret a claimant's medical records to determine [her]

RFC [but] must rely to some degree on RFC evaluations from a

physician or another expert," Piper v. Berryhill, No. 16-cv-455-

JL, 2018 WL 1392908, at *2 (D.N.H. Mar. 20, 2018) (quoting

Delafontaine v. Astrue, No. 1:10-cv-027-JL, 2011 WL 53084, at *

(D.N.H. Jan. 7, 2011)).

Because Dr. Shulik's evaluation was not a medical opinion, it was not subject to evaluation under 20 C.F.R. §§ 404.1527 & 416.927 in the first instance.  Accordingly, the court need not make this order any longer than it already is by addressing arguments by the parties that treat Dr. Shulik's evaluation as if it were a medical opinion.  More importantly, because Dr. Shulik's evaluation as not a medical opinion, it was not a reversible error for the ALJ to determine – perhaps unnecessarily – that that evaluation was entitled to little weight.[24]

## IV. Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Deoliveira's claim, see Manso-Pizarro, 76 F.3d at 16, her motion for an order reversing the Acting Commissioner's decision[25] is denied, and the Acting Commissioner's motion for an order affirming her decision[26] is

---

[24] Finally, to the extent that claimant relies upon Dr. Shulik's evaluation for the proposition that she lacked enough capacity for memory to perform work-related activities, the only actual opinions on that issue come from her treating psychiatrist, who opined that she had a limited but satisfactory capacity to understand, remember, and carry out detailed instructions.

[25] Document no. 8

[26] Document no. 9

granted.  The clerk of the court shall enter judgment in favor of the Acting Commissioner and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  January 2, 2019

cc:  D. Lance Tillinghast, Esq.
     Terry L. Ollila, AUSA